355 F.Supp. 574 (1973)
In re BROWN COMPANY SECURITIES LITIGATION.
J. Wolfe GOLDEN and Fannette P. Stone, etc., Plaintiffs,
v.
GULF & WESTERN INDUSTRIES, INC., Brown Company, et al., Defendants.
Raymond W. CROMER & Marybelle K. Cromer, Plaintiffs,
v.
GULF & WESTERN INDUSTRIES, INC., Brown Company, et al., Defendants.
Michael SHAPIRO, etc., Plaintiff,
v.
GULF & WESTERN INDUSTRIES, INC., Brown Company, et al., Defendants.
M. D. L. No. 67; Civ. A. No. 70 Civ. 5371.
United States District Court, S. D. New York.
January 22, 1973.
*575 Paul Bernstein, Ronald Litowitz, and Max Berger, of Kriendler & Kriendler, New York City, Robert Jarvis, of Beck, McGinnis & Jarvis, Pittsburgh, Pa., David Berger, P.A., Philadelphia, Pa., for plaintiffs.
Roy L. Reardon and James G. Greilsheimer, of Simpson, Thacher & Bartlett, New York City, for Gulf & Western Industries, Inc.
Leon Silverman and Matthew Gluck, of Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant Brown Co.
Robert Block, of Pomerantz, Levy, Haudek & Block, New York City, for individual defendants.

OPINION WITH RESPECT TO PROPOSED SETTLEMENT
ALVIN B. RUBIN, District Judge:
The parties to these consolidated class actions have agreed to settle the claims of those who were formerly preferred stockholders of Brown Company ("Brown") arising out of an exchange of their stock for debentures and warrants on June 9, 1970. Notice of the *576 proposed settlement was given to all members of the class. Judicial approval of the settlement is now sought, in accordance with the requirements of Rule 23(e), F.R.Civ.P.
The original class consisted of the holders of 597,913 shares. The holders of 15,018 shares exercised their option not to be included in this action. One of these, Belsky & Co., Inc., ("Belsky") the holder of 2500 shares, requested the opportunity to revoke this "option out" so it could oppose the proposed settlement. Only Belsky appeared at the hearing held to determine whether the settlement would be approved.[1] In addition, the holders of 826 other shares filed written oppositions.[2]
The duties of the court with respect to a proposed settlement require it first to reach "an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated" and "form an educated estimate of the complexity, expense, and likely duration of such litigation . . . and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." Protective Committee v. Anderson, 1968, 390 U.S. 414, 424-425, 88 S.Ct. 1157, 1163, 20 L.Ed.2d 1. Accordingly, we first consider the nature of the action and the potential evidence that has been developed in order to determine the likelihood of success by the plaintiffs and the likely quantum of damages in the event of recovery.

SUMMARY OF ACTION AND PROPOSED SETTLEMENT
Brown is, and has been for many years, a manufacturer of a variety of forest and paper products. Brown's common stock is listed on the New York Stock Exchange as was its preferrred stock prior to the recapitalization. At all relevant times the majority shareholder of Brown was defendant Gulf & Western Industries, Inc. ("G&W"), a diversified company, commonly called a conglomerate, based in New York. The individual defendants were officers or directors of Brown.
The essence of plaintiffs' case is that Brown and its controlling shareholder, G&W, effected the recapitalization for the benefit of G&W and to the detriment of the minority Brown preferred shareholders in violation of the federal securities laws and the common law, in breach of the directors' fiduciary obligations, and as a tortious interference with the contractual relationship between Brown and the preferred shareholders.
The proposed settlement seeks to readjust the package given to these minority shareholders by awarding them a gross additional consideration of $1,600,000, amounting to $2.75 per share, payable in the same warrants they were given as *577 part of the original package. If defendants fail to comply with certain conditions, the additional consideration will be paid in cash. It is proposed that attorneys' fees be allowed in the amount of $400,000, or 69¢ per share, making the net recovery $2.06 per share.

PRIOR PROCEEDINGS
This is a consolidation of three class actions, J. Wolfe Golden et al. v. Gulf & Western Industries, Inc., et al. (S.D.N. Y.); Raymond W. Cromer & Marybelle K. Cromer v. Gulf & Western Industries, Inc., et al. (W.D.Pa.), and Michael Shapiro, etc. v. Gulf & Western Industries, Inc., et al. (E.D.Pa.).
Shortly after the commencement of these three actions, defendants moved, pursuant to 28 U.S.C. § 1407, for the transfer of these actions to the Southern District of New York, and for coordinated and consolidated pre-trial proceedings including these suits and an individual action entitled Henry Folger v. Brown Company. That motion was granted by the Judicial Panel on Multidistrict Litigation on April 6, 1971, 325 F.Supp. 307, and these actions were accordingly transferred to the United States District Court for the Southern District of New York and assigned to Judge Alvin B. Rubin, of the Eastern District of Louisiana. Subsequently, an order was entered pursuant to 28 U.S.C. § 1404 and F.R.C.P. 42 transferring these actions to the United States District Court for the Southern District of New York for all purposes and consolidating them for all purposes. All proceedings have been held in the Southern District of New York except a conference to review the notice of the proposed settlement and to set a date for hearing on it, which was held in New Orleans, Louisiana. There have also been conferences among all counsel and the court by telephone, with the judge participating from his chambers in New Orleans, Louisiana.
By order dated June 4, 1971 this Court, pursuant to F.R.C.P. 23, determined that these actions were maintainable as class actions on behalf of all persons who were holders of Brown preferred stock on May 1, 1970 and their successors in interest, i.e., executor, administrator, trustee, heir, beneficiary or assignee, except defendants, and on October 5, 1971 notice of this determination was given to members of the class by mailing it to all preferred shareholders of record as of May 1, 1970.

THE TRANSACTIONS UNDER ATTACK
Pursuant to stipulation, plaintiffs were permitted to file a joint amended complaint superseding the individual complaints previously filed. After the conclusion of plaintiffs' discovery a second amended complaint was filed.
The Joint Second Amended Complaint is primarily concerned with the Brown Proxy Statement dated May 8, 1970 (the "Proxy Statement") which was sent to the members of the Class in connection with a special meeting of Brown stockholders held on June 9, 1970. At that special meeting, stockholders of Brown (including, by a two-thirds class vote, the preferred stockholders) approved a re-organization of Brown that served to convert the preferred stock into debentures and warrants. The reorganization was accomplished by means of a merger of Brown and a wholly owned subsidiary created for that purpose (the "Merger"). Pursuant to the Merger, each share of preferred stock was converted into a $19 face amount subordinated debenture with interest at the rate of 9% per annum[3] and 1¼ warrants, each warrant for the purchase of one share of Brown common stock at a price of $16.50 per share. In addition, the stockholders of Brown at this meeting approved the acquisition by Brown of approximately 82% of the Class A common *578 stock and all of the preferred stock of Livingston Rock & Gravel Co., Inc. ("Livingston").

PLAINTIFFS' ALLEGATIONS
The major allegations of the complaint, as it was finally put to the court, after amendment to delete claims found during discovery to lack merit, and to add claims learned of through discovery, can be briefly summarized as follows:
Since August 1968 when G&W completed a successful tender offer for the common and preferred stock of Brown, G&W and the individual defendants controlled Brown and operated it for their own benefit and to the detriment of the preferred stockholders. For some time the defendants fraudulently schemed to destroy the preferences and rights of the Brown preferred stockholders and embarked upon a course of conduct designed to carry this scheme into effect. Plaintiffs claim that this scheme was ultimately effectuated by means of an unfair merger and a false proxy statement.
In addition to their charge of a fraudulent scheme, plaintiffs make numerous allegations claiming that the Proxy Statement was false and misleading in several material respects. These allegations are discussed in more detail below.
Plaintiffs also claim that the Merger was unfair to members of the Class and that the acquisition of Livingston was detrimental to the members of the Class. The Joint Second Amended Complaint asserts that the actions of the defendants constituted violations of §§ 12(2) and 17(a) of the Securities Act of 1933 and §§ 10(b) and 14(a) of the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder. In their prayer for relief, plaintiffs seek damages equal to the difference between the value of the Brown preferred stock and the value of the debentures and warrants issued in exchange therefor and claim that the value of such preferred stock was equal to its redemption price as of June 9, 1970 plus accrued dividend arrearages.
As of June 9, 1970, Brown preferred stock had an alleged estimated liquidation value of $33 per share and a redemption price of $34.65 per share. Both liquidation and redemption were solely at the option of Brown and could not be compelled by the preferred shareholders. In addition, as of that time, there were accumulated dividend arrearages of $2.25 per share on the preferred stock representing six quarters of nonpayment. On that date, however, the preferred stock traded on the New York Stock Exchange at $11.50 per share. During 1970 it had traded at prices ranging from a high of $17.63 to a low of $9.50. In 1969 it had traded at prices ranging from a high of $21.75 to a low of $13.

DISCOVERY
Commencing almost immediately after the transfer and consolidation of these actions, and continuing for almost nine months, plaintiffs served and obtained responses to extensive written interrogatories and requests for admissions. In addition, in response to requests for the production of documents, defendants produced vast quantities of documents (of which approximately 10,000 were copied by plaintiffs).
The court required a deposition schedule to be proposed that would enable the trial of the matter to be reached as soon as reasonably possible. The pre-trial orders contemplated discovery of writings followed by an intensive period of oral depositions.
After the completion of the "first wave" written discovery, plaintiffs served approximately 75 "second wave" interrogatories and document requests to which defendants again responded.
Plaintiffs then deposed twelve of the individual defendants or employees of the corporate defendants plus fourteen *579 separate third-party witnesses.[4] These depositions took place at an average rate of two per week for four months and resulted in approximately 5,000 pages of transcript.
At the conclusion of the discovery proceedings, plaintiffs and defendants entered into protracted and arm's length settlement negotiations, which have resulted in the present proposed settlement. Defendants contend that they would prevail in this action and demonstrate that the charges made by plaintiffs are without merit; that they have agreed to pay the compromise sum solely to have peace from the risks inherent in litigation and from the cost of a trial that would likely be extended and expensive.

FURTHER FACTUAL BACKGROUND
In 1966, Brown merged with KVP Sutherland, a Michigan based paper manufacturing company. As a result of the merger, each share of KVP stock was converted into one share of Brown preferred stock. This was the genesis of the preferred stock here in issue.
In early 1968 G&W decided to invest in Brown. Through a private transaction, it acquired 23% of Brown's common stock from Brown's principal shareholder. A few months later, after investigation, G&W concluded that it would like to own all of Brown's stock and, accordingly, made a public offer to exchange certain G&W securities for Brown's common and preferred stock. On August 1, 1968, at the close of the G&W tender offer and as a result thereof, G&W acquired 40% of Brown's preferred stock and an additional 45% of Brown's common stock, giving it a total of 68% of the outstanding Brown common and, therefore, effective control of Brown.
From the time of G&W's first investment in Brown, its nominees served on the Brown Board of Directors and, at the times of the acts complained of, the majority of Brown's directors were either senior executives of G&W or had other close ties to G&W. Also, during 1968 and the first half of 1969, various G&W executives from time to time assisted in the day to day operations of Brown, including taking a leading role in the relations between Brown and its lenders.
Brown was a relatively small manufacturer in the highly competitive and cyclical paper industry with rather poor historical earnings. It compared unfavorably with other companies that G&W had acquired at or prior to that time, but it was acquired with the hope that G&W management could render Brown's operations profitable.
After the acquisition, representatives of G&W investigated further the business and operations of Brown in detail. Brown was saddled with a high debt burden arising out of exceptional capital expenditures incurred in an effort to improve and modify Brown's most important facilities, its paper mills in Espanola, Canada and Berlin, New Hampshire. However, still optimistic, G&W decided to increase its holdings in Brown and in July, 1968 made an exchange offer to Brown's common and preferred stockholders. That exchange offer was successful and G&W became the owner of 68% of Brown common stock and 40% of its preferred stock.
In early 1968 the Brown Board of Directors voted to discontinue dividends on the Brown common stock; in late 1968 it voted to discontinue dividends on the Brown preferred stock. The major facilities at Espanola and Berlin continued to be unprofitable and inefficient. Despite the efforts of G&W to aid Brown management, including the assignment of a regular G&W employee to duties as a full-time consultant, losses continued. As a result, it became clear by the fall of 1968 that Brown would be unable to meet its obligations under its loan agreements and was threatened with imminent *580 default. In short, Brown was at the verge of bankruptcy.
In an effort to remedy the situation, Brown sold some of its most unprofitable operations, including in particular the Canadian division. This resulted in a loss of $20,000,000 but generated cash that could be used to pay Brown's lenders.
In the fall of 1968 negotiations were opened to avert default under the Brown loan agreements. If the loan agreements could not be amended in a way satisfactory to the Brown lenders, it was likely that Brown would be placed in receivership. These negotiations continued through the middle of 1969, until, finally, acceptable amendments were agreed upon.
Brown's operations continued to be unprofitable. This was particularly true of the Berlin plant, Brown's most important division. In June, 1969, G&W assigned a new management team to Brown, headed by Merrill Nash who had established a reputation for successfully rehabilitating ailing companies as their chief executive officer.
After assuming the presidency of Brown, Mr. Nash acted in three major areas to improve Brown's condition. First, he investigated whether the more unprofitable operations of Brown, including the Berlin facility and surrounding lands, could be disposed of, both to improve Brown's profit picture and to yield the cash necessary to meet loan obligations and to support the other aspects of Brown's business. He was unable to accomplish this. Second, he determined to expand Brown's operations into other areas of endeavor that were less cyclical than the paper industry, and could yield better earnings. Of particular interest in this regard was the construction industry. Finally, he examined Brown's capital structure to see what had to be done to make Brown a more viable company.
It became clear to Mr. Nash and the other members of Brown management that the existence of the Brown preferred stock with its dividend arrearages, which had no prospect of being paid in the foreseeable future, was a detriment not only to Brown's general standing in the business and financial community, but to its ability to diversify. Therefore, by the summer of 1969, Mr. Nash, in conjunction with the other members of Brown management, determined that it was necessary to find a formula by which the preferred stock could be exchanged for some other form of security.
For several months Brown management considered what form of security could provide fixed payments to the preferred stockholders. After deciding on a debenture with interest payable in cash or stock, management considered possible terms, evaluated their fairness to preferred and common stockholders, and studied the effects of such terms on the future financial condition of Brown. Prior to a final formulation, Brown consulted Goldman, Sachs & Co. and Lehman Brothers, whose proposals it considered to be too generous to preferred stockholders and thus unfair to the common stockholders.
Finally, the terms proposed by Brown management were evaluated by Bear, Stearns & Co. Bear, Stearns & Co. refused to approve the terms unless changes were made in favor of the preferred stockholders. These changes included increasing the face amount of the debenture, lowering the exercise price of the warrants, permitting the use of the debentures at face for the exercise of the warrants, and increasing anti-dilution protection of the warrants. Some of these changes were made, but Brown refused to make others and Bear Stearns agreed to approve the proposal as thus altered.

THE ISSUES
Based on the foregoing, the basic issues in the lawsuits may be summarized as follows:
1. Did G&W and the Brown Board of Directors (i.e. the individual defendants) embark upon and effect the *581 elimination of Brown's preferred stock by means of fraud?
2. Was the June 9, 1970 shareholder approval obtained by means of a proxy statement that was materially false and misleading?
3. To what extent, if any, was each class member damaged?

THE ALLEGATIONS WEIGHED AGAINST THE EVIDENCE NOW AVAILABLE
The complaint herein alleges the charges by which plaintiffs intend to prove liability and it assesses the damages at the absolute maximum, i.e. the redemption value of the preferred less the minimum value of the package given in exchange. The charges, of course, were made at a time when plaintiffs necessarily lacked the detailed evidence by which they could be proved. In the circumstances of this case, such evidence could only come from the files and the testimony of defendants and other persons involved with defendants.
In summary, after detailed discovery and investigation, although there is considerable doubt (and vigorous disagreement on the part of defendants), plaintiffs' lead counsel asserts that, on balance, he believes that plaintiffs would prevail at trial on the liability issues noted above. Plaintiffs' lead counsel is mature, able, and experienced in this type of litigation. He has had the assistance of other able and resourceful counsel. When pressed by the court to estimate the probability of a judgment for plaintiffs, he fixed this as somewhere between 51-49 and 60-40. But plaintiffs' counsel also asserts that, having learned something about the defense evidence, there is little likelihood of plaintiffs being able to prove damages near the amount sought in the complaint, or indeed at an amount much in excess of the value of the consideration that defendants have now agreed to pay.

1. Fraudulent Scheme

Although there are facts that, on first impression, might lead to the conclusion that G&W, from the inception of its interest in Brown, deliberately embarked on a course of conduct to depress the value of the Preferred Stock and then eliminate it for an unfairly low consideration, exploration of such facts renders the conclusion sufficiently questionable to warrant settlement.
Thus, discovery concerning an analysis of Brown's pre-G&W financial condition, debt obligations, and losses being incurred by foreign operations indicates that, at the very least, it was a matter of business judgment for Brown to agree with its lenders to suspend cash dividend payments under certain conditions, to discontinue its money losing operations, and to renegotiate the terms of its long term loans. The testimony of Robert E. Hartford, Senior Investment Officer of John Hancock, the lead Brown lender, confirms that at the critical times, Brown's lenders demanded restrictions on the distribution of dividend payments by Brown to its preferred shareholders. Capitulation by Brown was necessary in light of the fact that Brown's lenders could have placed Brown in default virtually at will.
The one area where the plaintiffs contend they find substantial evidence of impropriety is in the formulation of the package to be exchanged for the Brown preferred on the recapitalization. They contend that a conflict of interest existed between the preferred shareholders on the one hand and the common stockholders, including G&W, the 68% holder, on the other.
Thus, if the preferred shareholders were given too much, it necessarily came from the equity allocable to the common stockholders, and conversely, if the preferred shareholders' position on the balance sheet was replaced by a value lower than its real worth, benefit inured to the common stockholders. Or, stated another way, if the financial drain caused by the package given to the preferred shareholders was too great, the effect would be to impede the growth of the common stock; and if the drain was not great, the direct result would be in *582 creased earnings and higher common stock prices.
With such a clear conflict, the plaintiffs assert, structuring the terms of the recapitalization should have been the province of an expert in corporate finance, free from any hint of influence from G&W. Brown first consulted Goldman Sachs, and Lehman Bros. and each of these highly reputed investment bankers proposed a package for the preferred shares. Brown, however, concluded that both Lehman Bros. and Goldman Sachs were being "overly generous" to the preferred shareholders. This, it is asserted, constituted a decision made with a conflict of interest, and in favor of G&W.
Brown then structured a package of its own that it thought fair for the preferred shares. Thereafter, at the suggestion of G&W's executive vice president, Brown went to Bear Stearns, another well known investment banker, to seek an opinion that the Brown proposal was fair and equitable.
The record at this point clearly indicates two important elements in plaintiffs' case. First, Bear Stearns had numerous prior business relationships with G&W and a jury might find that it was indebted to G&W for substantial past business favors. Second, although Bear Stearns finally rendered an opinion that the proposal was fair and equitable to preferred shareholders, it initially had serious questions about the package being considered.
Taking the evidence in the light most favorable to plaintiffs a jury might decide that defendants rejected the expert opinion of Goldman Sachs and Lehman and shopped around until they could find a friendly investment banker to put its approval on a package that was knowingly unfair to the preferred shareholders.
This argument, however, as the plaintiffs themselves point out, has potentially fatal flaws. At the outset, it cannot be said unqualifiedly that the packages proposed by Goldman Sachs and Lehman were more valuable than that finally approved by Bear Stearns. The initial proposals were for convertible debentures on certain terms while the final package was a debenture with different terms, a smaller face amount, and a detachable warrant. Estimates of the fair market value of each of the three packages varied and estimates, are in fact, only estimates. No one will ever know how the market would have responded to the other packages. Defendants might argue and prove that in fact the final package was more valuable than the earlier proposals.
Next, the final package was proposed sometime after Lehman and Goldman Sachs reviewed the picture. Thus, since a somewhat volatile and deteriorating situation existed at Brown, it is possible that Lehman and Goldman Sachs might have revised their initial proposals downward in the light of Brown's increasing problems and the then unfavorable stock market conditions.
Finally, there is no direct evidence that Bear Stearns did not act impartially. The fact of the prior substantial fees paid by G&W raises a question, but that is not proof of wrongdoing. Who can say who is most vulnerable to the lure of potential future business from G&W  a firm such as Bear Stearns, which has had some of that business, or a firm that previously had no such business but is anxious to get into the good graces of G&W to attract future business?
Following discovery, plaintiffs' counsel contend that at the very least, defendants were less than judicious in going from Lehman and Goldman Sachs to Bear Stearns as they did, when they did. However, the questionable propriety of this conduct might not be held to rise to the fraud that must be found to sustain a claim under the securities laws. In view of the actual evidence relating to the allegations concerning Bear Stearns and the fraudulent scheme, counsel entertained a grave question whether plaintiffs could sustain their *583 burden of proof and prevail on this issue.
At trial, plaintiffs would be required not only to prove the falsity of the statement or the misleading nature of any omission from it, but also the materiality of each statement or omission to the transaction. Furthermore, a somewhat lesser evidentiary hurdlereliancealso confronts plaintiffs, although in view of such cases as Mills v. The Electric Auto-Lite Co., (1970), 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 and Affiliated Ute Citizens of Utah v. United States, (1972), 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741, proof of reliance no longer appears to be a serious problem in securities cases such as this.

ALLEGED FALSE STATEMENTS IN AND IMPROPER OMISSIONS FROM PROXY STATEMENT
There are two principal areas of complaint with respect to the proxy statement. These are first discussed below. Then follows a discussion of various other issues raised with respect to the statement.

1. Bear Stearns Role

The proxy statement, at page 8, advises the stockholders that "the investment banking firm of Bear Stearns & Co. has advised the Board of Directors of the Company that in their opinion the terms of the proposed merger as set forth herein are fair and equitable." The proxy statement also disclosed that Bear Stearns had acted and continues to act as one of the G&W brokers and investment advisers.
The proxy statement did not, however, disclose that Brown had previously consulted two other investment bankersGoldman Sachs and Lehman Brothersconcerning the proposed elimination of the preferred stock and that each had proposed an exchange package believed to be substantially more valuable than that finally agreed to by Bear Stearns.
Furthermore, the proxy statement did not disclose the extent of Bear Stearns' involvement with G&W: during the 2½ years prior to the proxy statement, Bear Stearns had been paid over $750,000 by G&W in brokerage commissions alone. It is also contended that the stockholders should have been made aware that Bear Stearns at first refused to go along with certain aspects of the proposed package and then compromised its position after a private meeting with the Chairman and chief financial executive of G&W, no Brown representative being present and no significant improvement in the package being made.
Finally, the lack of independence of Bear Stearns is assertedly evidenced by the fact that drafts of their opinion letters were submitted to Brown's resident counsel for revision, comment, etc.

2. The Brown Timberlands

No aspect of plaintiffs' case received as much attention as their claim that the Brown timberlandsapproximately 600,000 acres in Maine, Vermont and New Hampshirewere worth substantially more than their book value and that the Proxy Statement was false and misleading in failing to make a statement about the "true" value of these timberlands. Thousands of documents were produced concerning the Brown timberlands. Numerous interrogatories were answered on the same subject and virtually every witness deposed was questioned at length about this subject. Certainly it is fair to conclude that plaintiffs viewed this issue as the very core of their case.
However, on examination, the theories held by plaintiffs at the outset concerning this central allegation cannot be supported.
Throughout this action plaintiffs have contended that Brown was obligated to make a representation as to the value of the timberlands different from the figure at which that asset was carried on Brown's balance sheet (in accordance with sound accounting practice). Discovery has shown that: (a) Brown did not intend to sell these timberlands; (b) Brown did not intend to liquidate; (c) Brown had not received any offers for *584 the timberlands; and (d) Brown did not have any outside appraisals for the timberlands. In short, plaintiffs' case rests in great part upon the claim that Brown was required to speculate as to the value of its assets.
On balance, the documents and deposition testimony tend to support Brown's position. In these circumstances, cases such as Gerstle v. Gamble-Skogmo, Inc., E.D.N.Y.1969, 298 F.Supp. 66; Feit v. Leasco Data Processing Equipment Corp., E.D.N.Y.1971, 332 F.Supp. 544; and Speed v. Transamerica Corp., D. Del.1951, 99 F.Supp. 808, which at first blush appeared to be directly in point, would have to be extended to new frontiers to cover the Brown situation.
It is clear, as a matter of law, that a company should not speculate as to the value of its assets in a public document. This is demonstrated by the decision of the Third Circuit in Kohn v. American Metal Climax, Inc., 3rd Cir. 1972, 458 F.2d 255, 265, cert. den., 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972). In that case, unlike the instant action, the value of assets was the basis of the terms of the merger under attack. Nevertheless the Court specifically rejected a claim that the failure to present the value of these particular assets was a violation of Rule 10b-5. The Court stated:
"Ordinarily the SEC and the courts discourage presentations of future earnings, appraised asset valuations and other hypothetical data in proxy materials. See Union Pac. R. v. Chicago & Nw. Ry., 226 F.Supp. 400, 408-409 (N.D.Ill.1964). But see Gerstle v. Gamble-Skogmo, Inc., 298 F.Supp. 66 (E.D.N.Y.1969) (presentation of book value misleading when substantially less than fair market value). We think this general rule should apply here. No truly reliable estimates of value ever materialized. The figures which the district court concluded should have been disclosed were all advanced by the parties during negotiations only and as part of their bargaining strategies. Under such circumstances we think the district court was not warranted in concluding that the omission from the proxy materials of the RST asset valuations was material." 458 F.2d at 265.
The holding in Kohn that unsupported estimates of asset value are not material is particularly applicable here. In the instant action, stockholders were merely being asked to exchange one form of security for another, there was no intention to dispose of the timberlands or to liquidate the company, and there was no objective appraisal readily available that would indicate a value materially different from book value.
Indeed, the only case that has indicated that valuation of assets may be proper in any circumstances, Gerstle, supra, concluded, with the support of the memorandum amicus curiae submitted by the Securities and Exchange Commission, that such valuation would only be permitted when the company (a) intended to dispose of such assets and (b) had in its possession either an offer to purchase such assets or a reliable outside appraisal of the value of such assets. Neither of these conditions apply in the instant action.
Moreover, even if we assume that the law permits the type of revaluation of assets that plaintiffs desire, the facts make it clear that such a revaluation would not have been proper at the time of the Proxy Statement and indeed would have been misleading. The Brown timberlands are the backbone of Brown's most important operationits paper mill and plant in Berlin, New Hampshire. The timberlands provide some of the wood for the mill and, more important, provide a reserve so that Brown may purchase wood at competitive prices and be assured of supply. Every witness who had any knowledge of the paper business testified unequivocally that it was totally meaningless to attribute any value to the timberlands alone since there could be no circumstances under which Brown would dispose of all or part of these timberlands *585 unless it were to discontinue its operations at Berlin entirely.
On the Brown balance sheet, the timberlands were carried at approximately $2,000,000 while the book value of the other assets that were part of the Berlin facility was approximately $40,000,000. No one questions that a hypothetical sale of the timberlands in 1970 would likely be at a price substantially higher than $2,000,000. However, the Berlin mill, because of its poor earning performance, and heavy debt burden, could not possibly be worth its book valueeven if it were possible to find a buyer for it alone. Both written and oral discovery have made it clear that, if such a sale were ever to take place, the Berlin mill and facilities would become virtually worthless. Every witness who had knowledge on the subject has testified that the Brown timberlands must be considered as part and parcel of the Berlin operation, and that the value of all of the assets of that operation did not exceed $40,000,000.
At the end of 1969, Brown management considered the sale of the Berlin facility. The extensive discovery about these events confirms the conclusion that the Berlin plant would have had little value without the Brown timberlands. In inquiring about possible sales of the Berlin facilities, Brown management discovered that nobody would be interested in purchasing the facility unless all of the Brown timberlands were a part of such sale. Furthermore, not only were no offers made for such facilities, but the highest indication that any prospect ever gave to Brown of a price it might be willing to pay for the Berlin facility was the book value of the entire operation. There is no certainty that Brown could have realized even the book value for the Berlin mill and all of the timberlands.
Thus, it is clear that it would have been misleading to have attributed any higher value to the Brown timberlands since that would have substantially overstated the value of the Berlin facility.
Finally, we should note that, despite extensive discovery concerning the recreational and second home use potential of the timberlands, there was no evidence that such potential had any materiality to the "value" of the timberlands. Indeed, the only major effort by Brown in that areaits entrance in 1970 into a joint venture to erect a hotel and ski facilities turned out to be singularly unsuccessful.
Plaintiffs conducted extensive examinations of the persons who drafted the proxy statement. What emerged is that these persons carefully considered the Brown timberlands and determined, based upon the applicable law and facts, that it would be improper to enter into hypothetical valuations. The discovery in this action demonstrates that the decision was correct.

3. Discount on Debenture

Plaintiffs maintain that the disclosure in the proxy statement that the debenture would trade at a substantial discount (footnotes pp. 14 and 20) should have been in a more prominent place. What may have been obvious to Lehman Bros., Goldman Sachs, Bear Stearns and G&W respecting market values of securities was not necessarily so obvious to a class constituted mainly of small conservative investors. See Mills v. The Electric Auto-Lite Co., 7th Cir. 1968, 403 F. 2d 429, rev'd on other grounds, 1970, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593; Norte & Co. v. Huffines, S.D.N.Y. 1968, 304 F.Supp. 1096. See also Rosenfeld v. Black, 2nd Cir. 1971, 445 F.2d 1337, 1349, wherein the Court criticized the use of par value instead of fair market value to describe securities being exchanged on a merger. Defendants contend that the disclosure was adequate and that it was not even necessary since investors should know about discounts on long term obligations. There assuredly was a disclosure. The sole issue concerns whether the facts were sufficiently brought to the stockholders' attention. The issue is, at best, in doubt.

*586 4. Amount of Dividend Arrearage

Concededly, Brown's cumulative preferred dividend of $1.50 per share per annum (which is payable quarterly on March 10, June 10, September 10, and December 10) was in arrears by six quarters, or $2.25, on March 10, 1970. The proxy statement, dated May 8, 1970, which relates to a vote to be held on June 9, 1970, provides (p. 8):
"The Preferred Stock is currently in arrears as to six quarterly dividend payments amounting to $2.25 per share . . . Upon consummation of the merger, the dividend arrearages on the Preferred Stock will be eliminated."
In filed documents following the vote, Brown and G&W both reported that the amount of cumulative dividend arrearage eliminated by the merger was $2.625 per share.
There is a dispute about whether the arrearages were in fact $2.625 or $2.25, and, if it was the larger sum, whether the difference was material within the meaning of the Federal Securities Laws.

5. Failure to Disclose Efforts to Sell Berlin-Gorham

The efforts to sell the Berlin-Gorham division have been discussed in detail. Had such a sale been effected, there would have been a substantial likelihood that the preferred stock's dividend arrearage would have been cleared and that Brown would be in a much sounder current financial position. Therefore, plaintiffs contend that the proxy statement should have disclosed Brown's efforts and intentions to dispose of Berlin-Gorham.
Here there is not only a question of materiality, but a sharply disputed factual issue.

6. Policy to Pay Interest in Cash

The facts on this issue, as developed on discovery, can hardly be disputed. The proxy statement states (p. 8) that "the company expects that its policy will be to pay interest on the Debentures in cash rather than in stock." Plaintiffs contend that Brown's management knew prior to the mailing of the proxy statement, that Brown's earnings and lender restrictions made it virtually impossible for the first annual interest payment to be made in cash. Indeed, although hindsight is probably not relevant, both the first (June 1971) and second (June 1972) payments were made in stock. Defendants contend this omission is not material.

7. Method of Valuing Common Stock

Plaintiffs believe that the shareholders should have been apprised of the method by which common stock to be issued as interest on the debentures would be valued. Defendants disagree. The real problem here, even if plaintiffs are correct, is the materiality of this omission.

8. Acquisition of an Interest in Livingston Rock and Gravel

Despite the fact that the Livingston acquisition benefited G&W as majority owner of Livingston and Brown as alleged, the evidence is that Brown, and consequently the members of the class, also benefitedprincipally from the tax shelter afforded Livingston's income (consolidated with Brown's) by Brown's prior losses on its sale of certain losing operations.

9. Changes in Lender Obligations

Discovery demonstrated that the changes to Brown's long term debt obligations and the additional consideration extended to the lenders resulted from Brown's dire and deteriorating financial condition rather than any collateral benefits granted to G&W by the lenders.

10. The 1968 Extraordinary Charge to Income

No evidence was found to prove that the discontinuance of the Brown operations that were in a loss position was dictated by considerations other than the proper business judgment of Brown's management.
The foregoing constitute the principal allegations of proxy fraud and a summary *587 of the state of evidence thereon. There were a few other allegations, some of which have been withdrawn by the amended complaint because of a lack of supporting facts, that do not merit discussion.
In sum, although there are contested issues of fact and law, most of which could be decided either way, plaintiffs believe that they would prevail on the issues of misrepresentation in the proxy statement.

MATERIALITY
The prevailing test of materiality was articulated by the Second Circuit in General Time Corporation v. Talley Industries, Inc., 2nd Cir. 1968, 403 F.2d 159, cert. denied, 1969, 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570, as follows:
"The test, we suppose, is whether, taking a properly realistic view, there is a substantial likelihood that the misstatement or omission may have led a stockholder to grant a proxy to the solicitor or to withhold one from the other side, whereas in the absence of this he would have taken a contrary course," 403 F.2d at 162.
The Supreme Court has recently restated this test in Mills v. Electric Auto-Lite Co., 1970, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593. In Mills, the Court held that an omission or misstatement in a proxy statement was a material one when it "was of such a character that it might have been considered important by a reasonable shareholder who was in the process of deciding how to vote." The Court emphasized that the misstatement or omission must "have a significant propensity to affect the voting process." See also Rosenfeld v. Black, 2nd Cir. 1971, 445 F.2d 1337; Chasins v. Smith, Barney & Co., 2nd Cir. 1970, 438 F.2d 1167; Robinson v. Penn Central Company, E.D.Pa.1971, 336 F.Supp. 655; Dillon v. Scotten, D. Del.1971, 335 F.Supp. 566; Berman v. Thomson, N.D.Ill.1970, 312 F.Supp. 1031.
It is noteworthy that in their answer to interrogatories, served after plaintiffs' extensive discovery, plaintiffs did not contend that any single misstatement satisfied the test of materiality. Their theory of materiality is based on combined impact. But there is at least a substantial doubt that a trier of fact would eventually hold that there were any misstatements or omissions in this Proxy Statement that had a significant propensity to affect the voting process of Brown preferred shareholders.

PROVABLE DAMAGES
It is the damage issue that plaintiffs' counsel concede to be the weakest link in plaintiffs' case, and it is on this issue that the opponents to settlement levy their strongest attack.
Whatever the impact of the liability evidence, there is a real possibility that plaintiffs will not be able to prove any actual damages whatever. Thus, if the debenture and warrants exchanged for the preferred stock were worth at least as much as the stock in 1970, then it is likely that the class members would get nothing even if the Proxy Statement were materially false and misleading and even if the defendants fraudulently schemed to eliminate the preferred stock for their own benefit.
The complaint speaks in terms of per share damages of approximately $28. This figure consists of counsels' maximizing the damages based on an assumed state of facts that later investigation and discovery has proved to be in all likelihood insupportable as a practical matter.
The preferred stock, at the option of Brown, was redeemable commencing one year after the merger for $34.65 per share plus accumulated dividends. Plaintiffs allege that the fraudulent scheme was, in effect, an illegal redemption and, therefore, the shareholders were damaged in the sum of approximately $37 per share less the value of the package offered in exchange. Again, plaintiffs selected the minimum *588 value for the packagei.e. the equivalent of $9 per share based on sporadic trading immediately following the June 1970 vote. Therefore, according to the complaint, the per share damages amount to $28 and the class damages total approximately $17 million.
But it is likely that neither the $37 value for the stock nor the $9 value for the debenture can be supported by the weight of the credible evidence.
First, the "redemption" theory's chances of success all but disappear in the face of the overwhelming evidence of Brown's poor financial condition and the paucity of facts to prove a "scheme" to redeem the stock illegally. The fact that a corporation such as Brown may voluntarily redeem its preferred stock for a fixed price does not mean it must do so. In view of this, we must turn to the "fair value" of the stock as the figure from which the value of the package must be deducted to determine damages.
Defendants argue, with some support from the authorities, that in a going concern such as Brown. whose stock is actively traded on the New York Stock Exchange, the market price of the stock is as good an indication of fair value as any other factor. The market price, of course, incudes the known cumulative dividend arrearage. Unless plaintiffs can prove that defendants committed acts that deliberately depressed the market price, it is likely that the trier of fact will accept the market price as conclusive. Nor is there substantial evidence to support the plaintiffs in sustaining the burden of proving that the defendants committed "depressive" acts.
In March 1970, at the time of the public announcement of the exchange, the Brown preferred stock was selling for approximately $16 per share. The $9 value for the package alleged in the complaint was selected based on the actual trading in the debentures and warrants after their issuance in late June and July 1970. This trading was minimal and sporadic and consisted mainly of the fractional interests resulting from the merger.
The problem with the $9 figure is that, even though it is technically correct indeed, it was Bear Stearns itself that made the marketit is probably not reflective of actual value because the entire investment community was affected by the collapse of the Penn Central in June 1970. All the investment indexes hit bottom in the June-July period and then slowly began to recover.
There is another aspect to the issue of damages. The fulcrum of the case, as to the claim that the Bear Stearns valuation was unfair, is that the Lehman Bros. proposal was higher, and, presumably fair. This was made by an admitted expert, and on an objective basis with full information. Lehman Bros. proposed an exchange of each share of preferred for a convertible debenture bearing a face value of $25, bearing interest at the rate of 8½% per annum. Everyone agrees that this would have traded at a discount; the minimum discount predicted by Bear Stearns on the later package prior to the Penn Central debacle was about 30%.
The debenture actually issued had a face value of $19, but an interest rate of 9%. It was accompanied by a warrant to buy common stock at $16.50. The actual debenture initially traded at about 40% of its face value, the warrant at about $1.00. The face value of the difference between the Lehman package and the Bear Stearns package was $6.00 minus the value of the warrant. If that is assumed to be $1.00, then the two proposals had a maximum difference in value of $5.00. But, this is a difference in face value only, and is not the actual dollar value difference of what the two packages would trade for.
From this maximum of $5.00 there are two inevitable deductions: first, the 9% yield of the Bear Stearns package is more attractive than the 8½% return of Lehman Bros. This would reduce the value differential in some amount; second, the difference in face value of the debentures must be adjusted by the expected market discount below face value. Bear Stearns estimated that the market would discount its debenture 30%; in *589 fact, that discount was much greater. But if we consider 30% of the difference in the value of the two packages as the minimum, then we would subtract 30% of $5.00. The amount thus computed, $1.50 is a discount traders would put on the face value of a package worth on its face $5.00 more. The net difference in value is $3.50. If the trier of fact decided a different discount was justified by the actual market, say 50%, then the net difference would be $2.50. Further subtracting the lesser value the Lehman package would have because of its lower yield, it is highly unlikely that a recovery more than approximately $3.00 per share could be attained.
It is indeed arguable that the exchange was in fact fair, as demonstrated by a comparison of the relative performance of the preferred stock and the debentures and warrants issued in exchange therefor. During the first five months of 1970, the Brown common stock traded on the New York Stock Exchange at approximately $10 per share. During that same period, the Brown preferred stock traded on the New York Stock Exchange for a price of approximately $15 per share. For approximately the last year and one-half, the Brown common stock has once again traded on the New York Stock Exchange at a price of approximately $10 per share. During this same time the market price of the debentures and warrants has constantly been in a range of approximately $18 to $21 exclusive of interest. Thus, in similar circumstances, the package received by preferred shareholders has been worth substantially more than the preferred stock both absolutely and with relation to the common.
This comparison is particularly meaningful because of the essential factors that governed the market value of the preferred stock. Since the Brown preferred stock was convertible, a major element in its maket value was the feature of convertibility. Thus, as can be demonstrated by reviewing the historic market prices of the preferred and common stock, the preferred traded at a measurable premium over the price of the common. This premium represented the convertibility factor plus, to some extent, other elements such as dividend arrearages and redemption price.
At the time the proposed merger was announced, March 19, 1970, the Brown preferred stock was trading at approximately $15 while the common stock was trading at about $10. These prices remained constant on the New York Stock Exchange through a period of almost two months. Subsequently, in the period May to June 1970, both the Brown common and preferred stock dropped substantially in price. Nevertheless, during the entire period between public announcement and consummation of the merger, the Brown preferred stock traded at a higher premium as compared to the price of common than had been the case historically.

THE TERMS OF THE SETTLEMENT
The major terms of the proposed settlement are as follows:
Each member of the Class will receive his proportionate share of the sum of $1,600,000, less whatever amount is awarded as counsel fees to plaintiffs' attorneys. If plaintiffs' attorneys are awarded a fee of $400,000, the amount they applied for, each class member will receive approximately $2.06 for each share of preferred stock previously held by him. Brown and G&W will each contribute one-half of the settlement amount. To qualify for participation in this settlement, class members will be required to complete Proofs of Claim and submit them within the time provided in the Stipulation.
The payments to class members will be made by means of Brown warrants, which are in all material respects the same as the warrants previously distributed to these same class members as a result of the merger and which, it would *590 appear, are still held by a great many class members.
The Stipulation of Settlement has been carefully drafted so that each class member will receive a number of warrants that, at the time of receipt, will have a current market value equivalent to the amount to which he is entitled. Thus, the warrants are to be valued according to their average closing price on the American Stock Exchange for twenty consecutive trading days ending fifteen trading days before actual distribution. Since the 15 day period is the absolute minimum period of time that will permit the administrative work of preparing the warrants for distribution, it can fairly be said that, to the extent practicable, class members will receive warrants having a contemporaneous market value equal to their proportionate share of the total class payment. This valuation formula also protects class members from risks arising from market fluctations.
The defendants are required to register the common stock underlying the warrants and to list them for trading on the American and Pacific Coast stock exchanges. Thus, class members are assured of the ability to sell their warrants on a public exchange and to exercise these warrants at $16.50. If registration and listing, for any reason, are not accomplished by the time provided in the Stipulation, then cash payment is mandatory.
The Stipulation also provides for a two stage payout with interest on the second installment at the rate of 6% per annum as well as on any distribution that has been delayed in order to accomplish registration or listing.

CONCLUSION WITH RESPECT TO SETTLEMENT
The role of the Court in passing on the propriety of such a settlement has been appropriately described by the Second Circuit as "a delicate one." Newman v. Stein, 2nd Cir. 1972, 464 F.2d 689, 691. See also Saylor v. Lindsey, 2nd Cir. 1972, 456 F.2d 896, 904. But the task is made somewhat easier by the fact that all of the discovery has been completed, and the case was at trial's eve when the settlement was proposed.
In evaluating the propriety of this settlement offer, the following have been considered: the potential expenses of further litigation, the plaintiffs' chances of success on the liability issues, the quantum of damages likely to be recovered in the event of success, the thoroughness of discovery and the likely direction of the evidence as revealed by it, the experience of counsel, the seriousness of the bargaining, and the public policy favoring settlement. See Protective Committee v. Anderson, 1968, 390 U.S. 414, 424, 88 S.Ct. 1157, 20 L.Ed.2d 1; Newman, supra; Saylor, supra; Glicken v. Bradford, S.D.N.Y.1964, 35 F.R.D. 144, 151; see also, Feder v. Harrington, S.D.N.Y.1972, 58 F.R.D. 171. Taken as a whole, the evidence indicates that the settlement is fair.
Having been given a full opportunity to show the basis for their opposition to the settlement, the opponents were unable ultimately to rely even on the argument that there was more to be had in the event of victory. Of the twenty-six witnesses deposed their exploration of the evidence was limited to an examination of the deposition testimony of only three persons, all being the testimony of Bear, Stearns employees[5] and a handful of the documentary exhibits. Of the voluminous evidence on the opposite side of the question, they read not a word.
The other four objectors filed written objections but did not appear at the hearing held to determine whether or not the settlement should be approved. Their written objections have been filed in the record. Together they own 826 *591 shares, or less than one-seventh of one percent of the total number of preferred shares involved. Only one of these dissenters made his objection through counsel. Necessarily, their study of the evidence developed through discovery by the plaintiffs and of the legal burdens of proof imposed upon the plaintiffs has been even more cursory than the efforts of Belsky Co. Generally they express a preference for getting more in settlement than has been offered, but they present no substantial factual or legal argument that was not heard contradictorily at the settlement hearing and has not been fully considered in weighing the adequacy of this settlement.
However, for the sake of completeness a brief resume of the substance of each objection and the conclusion reached with respect thereto is set forth below:
Mr. Geisler states that the settlement figure is too low and that he should receive the redemption value of $34 for the stock. Mr. Byers objected generally to approval of the settlement, and requested that the case be ordered to trial. Mr. Safran requests that defendants be made to pay court costs and attorneys' fees separately and in addition to the amount offered in settlement. Mr. Hamovit maintains that the attorneys' fees requested are unreasonable, and secondly, that in distribution of the warrants, they ought to be valued as of June 1970 (.75) instead of their present market value. Kane Associates contends that the class notice is inadequate, objects to receiving warrants of a variable value, and argues that the settlement figure is low. As is evident from the reasons previously stated, these arguments have been considered carefully and rejected. The court has exercised its responsibility as the guardian of these parties whose interests are at stake, and is satisfied that approval of this settlement is in their best interest.
At the time of the exchange giving rise to this lawsuit, the holders of 11,800 shares of preferred dissented and filed an action for appraisal under the Delaware Corporation Act. Counsel have stated to the court that the identical settlement offer made here has been extended to these dissenters and that thus far 10,400 shares have accepted.
At the class hearing, an investigation of the tax consequences of the settlement revealed that the value of the warrants received would be added to the consideration received by the stockholders in the original exchange. The evidence showed that, though the original exchange was a taxable one, none of the stockholders realized a gain because the market value of what they received was less than the basis of what they gave up. And, their basis would not have been lower than the market value unless they had purchased considerably prior to the exchange. It is unlikely that any stockholder will realize any taxable gain on receipt of these additional warrants.
The trial of this matter would be lengthyif to a jury it was estimated that it would require at least 30 trial days. The cost would be substantial. Putting the matter most optimistically, the plaintiffs' counsel see only a 60% likelihood of success; that means, of course, 40% chance of failure. The court's opinion of the probability of success is no higher, and its judgment of a likely verdict is only slightly more than the amount proposed to be paid in settlement. Hence, the proposal must be considered fair. The court would improperly jeopardize recovery of this substantial sum by denying approval.

THE DERIVATIVE ACTIONS
The derivative action, which, is one of the causes of action of the Belsky action, is not affected by the approval of this action, it is ordered severed and returned to the Southern District of New York for disposition by the procedures of that court.

*592 ATTORNEYS FEES
With respect to the nature of the services on behalf of the class, the court record in the case is perhaps the best evidence of the vigorous prosecution and defense of these actions. The many motions, the voluminous written discovery, and the detailed oral depositions not only demonstrate that the settlement is fair and adequate, but they also support the reasonableness of the attorneys' fees sought in view of the result achieved in the circumstances.
Lead counsel for the plaintiffs originally filed the Golden class action in the United States District Court for the Southern District of New York. It is unnecessary to note at length the multitudinous actions taken over the next 16 months. They are set forth in detail in the uncontroverted affidavit of Paul Bernstein, Esq.
The negotiations with respect to settlement were difficult and extended over the next several months. They culminated in the settlement proposal now before the Court.
Plaintiffs' lead counsel, Kriendler & Kriendler, has for almost twenty-five years engaged principally in massive complex litigation, and for almost twenty years Paul Bernstein, Esq. of that firm has been litigating both against and on behalf of major corporations. He and the firm in which he is a partner enjoy an outstanding reputation at the Bar.
Lead counsel has submitted an affidavit and evidence of time records demonstrating 3305 hours of work, more than half of this having been contributed by partners. Other counsel have submitted affidavits evidencing 1248 hours, for a total for all plaintiffs' counsel of 4553 hours. They move the court to allow total compensation in the amount of $400,000.00 or 25% of the settlement recovery.
In deciding upon a fee in these circumstances, "the amount of time spent is [not] the onlyor even the most important factor in granting an allowance." In the Matter of Borgenicht, 2nd Cir., 1972, 470 F.2d 283, per curiam of December 1, 1972. This is especially true where, as here, the attorneys' remuneration is contingent wholly on success. Absent a recovery for the class, there is no fee, and the thousands of hours expended go uncompensated. Accordingly, considerable emphasis must be placed on the relative ease or complexity of the litigation, the difficulties encountered and the result achieved.
In Trans World Airlines, Inc. v. Hughes, S.D.N.Y.1970, 312 F.Supp. 478, Judge Metzner detailed "what appear to be the generally accepted factors to be weighed in determining a reasonable attorney's fee" as follows (at p. 480):
"(1) whether plaintiff's counsel had the benefit of a prior judgment or decree in a case brought by the Government,
(2) the standing of counsel at the bar both counsel receiving the award and opposing counsel,
(3) time and labor spent,
(4) magnitude and complexity of the litigation,
(5) responsibility undertaken,
(6) the amount recovered,
(7) the knowledge the court has of the conferences, arguments that were presented and of work shown by the record to have been done by attorneys for the plaintiff prior to trial.
(8) what it would be reasonable for counsel to charge a victorious plaintiff."
Although the TWA litigation involved an antitrust suit claiming massive damages, the question of attorneys' fees was really no different than that presented here. After deciding that the major factors were the complexity of the problems presented, the skill of counsel, and the measure of success achieved, Judge Metzner awarded counsel fees of $7,500,000. This came to a "mix" rate (i.e. partners and associates) of approximately $128 per hour. In the TWA case, slightly more than one-third of the time was that of members of the firm; *593 in the subject case, considerably more than half is partners' time. See also Philadelphia v. Chas. Pfizer & Co., S.D. N.Y.1972, 345 F.Supp. 454 where Judge Wyatt awarded a fee based on a "mix" rate of $200 per hour; and Clark v. American Marine Corp., E.D.La.1970, 320 F.Supp. 709, aff'd 5th Cir. 1971, 437 F.2d 959.
Also, on a percentage basis, the present fee application is consistent with established precedent. Recently, in Rosenfeld v. Black, S.D.N.Y.1972, 56 F.R. D. 604, Judge Gurfein, in awarding reasonable plaintiffs' attorneys fees after approving the settlement of a stockholders' derivative action, specifically set the fee at "one-quarter of the recovery" the percentage there requested and the same as here requested. The Court observed:
"For the beneficiary [i.e. members of the class] the recovery bears analogy to windfall, while to the attorneys it is the hard earned fruit of assiduous and skillful labor. In these circumstances there need be no hesitation in awarding that percentage of the recovery which has been given freely, both in this Court and the State Courts, to perhaps lesser achievements in terms of special skill and novelty. "Traditionally, courts in this district and elsewhere have awarded fees in the range of 20% to 30% of the recovery. See Philadelphia Electric Co. v. Anaconda American Brass Co., 47 F.R.D. 557, 559 (E.D.Pa.1969), where 25% was awarded on a settlement of $22 million. Illustrative of awards in this Court, Judge Ryan (Richland v. Chatham, 66 Civ. 1930) awarded about 25%; Judge Levett (Stull v. Kaymarg Consolidated Corporation, CCH Fed.Sec.L.Rep. § 92,508) awarded 33 1/3 %; Judge Tenney (Jamison v. Barr, 69 Civ. 2795, unreported) awarded about 30%; Judge Tyler (Zeitlin v. Bergen, 66 Civ. 4479) awarded 24%."
Belsky does not oppose the amount requested for counsels' fees, conceding that it is fair. Of the other objectors, only one, Jerry Hamovit, the owner of 200 shares, challenged the amount of the attorneys' fees.
In view of all of the foregoing, the application for attorneys' fees for all plaintiffs' counsel in the sum of $400,000, is reasonable and therefore, is approved.
Ordinarily, counsels' recovery for a class is in cash, and attorneys' fees are paid as a portion of that recovery. Here, the recovery is in the form of securities. The defendants have offered to pay one-quarter of the settlement in cash, and the remaining three-quarters in securities. To require counsel here to accept 75% of their fee in warrants would require them to take more than 10% of the issue and thus make them an underwriter of the warrants under securities regulations, forcing upon them the potentially great liabilities attendant to that status. It would be unfair to require them to bear the burden of these risks, which are foreign to the nature of their usual compensation, after they have already borne the risks of contingent fee service. But, because they have expressed faith and confidence in the value of the settlement for their clients, it is not unreasonable to require them, to some extent, to stand equally with plaintiffs in sharing in the distribution in kind. For that reason, the fee requested by counsel shall be paid $108,000 in warrants and $292,000 in cash. The remaining cash shall be distributed pro-rata to the class members. The sum to be paid in warrants represents 9% of the total amount of warrants to be issued excluding the amount to be paid to Belsky, and is thus fixed to remain below the 10% figure that would make counsel underwriters.
In the course of the prosecution of these actions, plaintiffs' counsel have incurred out-of-pocket disbursements, exclusive of office overhead, in the sum of $15,634.57. Pursuant to the Stipulation of Settlement, defendants have agreed to pay this sum separately from and in addition to the settlement amount of $1,600,000.
NOTES
[1] Counsel for defendants chose not to oppose this motion on the basis of the prohibition of one-way intervention. (The F.R.C.P. now prohibits such one way intervention. See F.R.C.P. 23, Notes of the Advisory Committee, 39 F.R.D. 69, 106 (1966); 3 Moore's Federal Practice, ¶ 23.02-1, ¶ 23.55, p. 1160, fn. 39) but rather to extend to Belsky the identical offer of settlement it had made to the other class members. There being no objection, prior to the hearing of this case, Belsky Company was granted the permanent status of a class member and thus allowed to present objections to the settlement at the hearing. The defendants have agreed to increase their settlement offer by $2.06 per share for the Belsky stock, which is equivalent to the net value to be received by all the class members. This increases the total proposed settlement figure to $1,605,150.00.
[2] The objectors were: Kane Associates, 300 shares; Jerry M. Hamovit, 200 shares; Roy Safran, 16 shares, in joint tenancy; George Byers, 10 shares [an additional 10 shares were owned by a different party at the same address]; Albert Geisler, 300 shares [200 owned individually and 100 owned in joint tenancy], Note, Mr. Geisler states that he was the owner of 500 shares, but stockholder lists reflect ownership of only 300 shares.
[3] Interest may be paid in cash or Brown common stock of equivalent value. Since Brown has not achieved earnings sufficient to satisfy the restrictions imposed by its lenders before cash payments can be made, interest to date has been paid in common stock.
[4] Numerous additional documents were produced in connection with the depositions of the nonparty witnesses.
[5] See p. 57 of the hearing transcript. Only the depositions of Dormer, Kohlberg, and Benedek, all Bear, Stearns' employees, were read.